

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. DANIEL M. FEDOR, | ) **3 : CV-01-2226** )<br>) |
| Relators/Plaintiffs, | ) NO. ) |
| v. | ) FILED UNDER SEAL ) |
| UNITEDHEALTH GROUP, INC., UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE CORPORATION, D/B/A/ UNITED HEALTHCARE, | ) JURY TRIAL DEMANDED )<br>)<br>) |
| Defendants. | |

FILED
SCRANTON

NOV 21 2001

PER _____
                        DEPUTY CLERK

## COMPLAINT

NOW COME Plaintiffs, United States of America ex rel. Daniel M. Fedor ("Fedor"), by and through his counsel, and files this Complaint, stating as follows:

## PARTIES

1.    Daniel M. Fedor is a former employee of United Healthcare and a resident of Clarks Green, Lackawanna County, Pennsylvania. He brings this action on behalf of the United States of America in his capacity as an original source relator under the False Claims Act, 31 U.S.C.A. section 3729 et seq.

2.     On information and belief, United Healthcare is a corporation with its principal place of business in Hartford, Connecticut, and operating as a business unit of UnitedHealth Group, Inc. and/or United Healthcare Services, Inc. and/or United Health Corporation.  At all times material hereto, United Healthcare was the Durable Medical Equipment Regional Carrier (DMERC) Region A under the Medicare Act Part B.

## JURISDICTION

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1332 since it involves a federal question arising under a federal statute, the False Claims Act, 31 U.S.C. section 3729 et seq.

4.     Venue is proper in this Court because the acts that give rise to this case occurred in this district.  28 U.S.C. section 1391 and 31 U.S.C. section 3732.

## FACTS

5.     Medicare was enacted in 1965 as Title XVIII of the Social Security Act and has two parts, the Hospital Insurance Program (Part A) and Supplementary Medical Insurance (Part B).

6.     In accordance with Section 1834 (a) of the Medicare Act, the Department of Health and Human Services (HHS) intended to enter contracts with

four insurance companies, known as "carriers" to perform all services associated with the processing of claims for durable medical equipment, prosthetics, orthotics and supplies (DMEPOS) under Part B.

7.    Beginning in 1996 and continuing through 2000, United Healthcare was the carrier or DMERC for Region A, one of four regions nationally, which consisted of Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island and Vermont.

8.    As DMERC, United Healthcare had the duty to process claims for DMEPOS in compliance with federal regulations, Medicare Carriers' Manual (MCM) guidelines and the Health Care Financing Administration (HCFA) Statement of Work (SOW).

9.    In particular, United Healthcare had to comply with MCM Sections 5104-5106 and Section C.3.m of the SOW (the "Telephone Standards"), which relate to telephone service for providers and beneficiaries.

10.    The Telephone Standards require that the "all trunks busy" (ATB) rate shall not exceed 20%. In other words, no more than 20% of all incoming calls from providers or beneficiaries could receive a busy signal.

11.    As to the remaining 80% of the calls, the Telephone Standards required that they enter an Automated Response Unit (ARU) that would handle

3

routine questions from beneficiaries and suppliers.

12.    Under the Telephone Standards, the ARU was to include a sufficient number of customer service representatives (CSR) who would respond to provider or beneficiary questions.

13.    United Healthcare was required by the Telephone Standards to have sufficient staff available in the Customer Service Unit (CSU) to meet the following standards: Hold time (i.e. the time a caller waits for a CSR) shall average no more than 120 seconds for 97.5% of applicable calls; on a monthly average 80% being answered within the first sixty seconds (the "Customer Service Calls").

14.    United Healthcare was also required under the Telephone Standards to ensure that all CSRs were measured for quality call handling for responsiveness, clarity and courtesy.

15.    Moreover, the Telephone Standards required that United Healthcare on request, but no more frequently than quarterly, provide accurate information to the government concerning the functioning of the CSU unit.

16.    By no later than 1996, United Healthcare undertook a scheme to defraud HCFA as it related to United Healthcare's compliance with the Telephone Standards.

4

17.    Specifically, Joseph Koslick, the manager of the customer service department, understood that United Healthcare did not employ sufficient CSRs to meet the Telephone Standards.

18.    In particular, his staff could not answer 97.5% of the Customer Service Calls within 120 seconds.

19.    Koslick further understood that failure to meet the Telephone Standards for Customer Service Calls would not only result in a breach of the Telephone Standards but would also jeopardize United Healthcare's chances of renewing its DMERC Region A contract with HCFA.

20.    Accordingly, Koslick commanded his CSRs to manually disconnect Customer Service Calls if they could not be answered within 120 seconds (the "Manual Release Fraud").

21.    Koslick commanded no fewer than five United Healthcare CSRs to participate in the Manual Release Fraud by disconnecting Customer Service Calls so as not to violate the 120 second response standard. Those employees included William Ferguron, Nancy Kinney, Heidi Davis, Paul Komishock and Cheri Cross (the "CSR Enlistees").

22.    Koslick and the CSR Enlistees were able to monitor how long callers were holding by looking at timers on their telephone consoles. As hold time

5

approached 120 seconds, the CSR conspirators answered a call and then immediately disconnected it.

23.    Thus, while United Healthcare represented to HCFA  that it was meeting Telephone Standards for Customer Service Calls, this was not the case in fact.

24.    Moreover, Koslick actually maintained, or could obtain information about the "real" performance of the CSRs by reviewing telephone data reflecting average length of telephone calls. This data would reflect the calls disconnected by the CSR Enlistees as one (1) second in duration.

25.    The Manual Release Fraud perpetrated by Koslick and the CSR Enlistees was successfully implemented, as HCFA reported in its review for fiscal year 1997 that United Healthcare had met its customer service requirements, including the Telephone Standards. (See exhibit "A" attached hereto.)

26.    The CSR Enlistees and Koslick were so successful in implementing the Manual Release Fraud that they openly joked about their "efficiency."

27.    Koslick and United Healthcare were plainly aware of the Telephone Standards, placing them first in a list of "Required Activities" in a United Healthcare memorandum relating to FY 1998 Budget and Performance Requirements.  (See Exhibit "B" attached hereto.)

28.    Indeed, Koslick and United Healthcare claimed in the FY 1998 Budget Memorandum that they could provide to HCFA computer reports validating United Healthcare's compliance with the Telephone Standards.

29.    This representation was knowingly false given an enhancement in the Manual Release Fraud that United Healthcare implemented in 1997.

30.    Specifically, by 1997, Koslick and United Healthcare sought to automate the manual disconnect system for Customer Service Calls as implemented by the CSR Enlistees.

31.    United Healthcare had determined that its staff was of insufficient size to answer 97.5% of the Customer Service Calls within 120 seconds and that it had to limit the number of calls in the system to ensure it would meet the Telephone Standards.

32.    In fact, United Healthcare had concluded that to meet the Telephone Standards for Customer Service Calls with its current CSR staffing, no more than 7 providers, or 5 beneficiaries, could be allowed to hold in queues for CSRs (the "Q Cap").

33.    Accordingly, United Healthcare had arranged to place a cap on the number of provider or beneficiary calls that would hold for CSRs (the "Q Cap Fraud").

7

34.    The automated Q Cap Fraud worked this way. Once Customer Service Calls had cleared the ATB and arrived in the ARU, an AT&T queue cap would begin to operate.

35.    All other customer service calls were routed to a busy signal and ultimately out of the system.

36.    The Q Cap Fraud resulted in two separate knowing violations of the Telephone Standards.

37.    First, far more than 20 % of the providers and suppliers were receiving busy signals, in violation of the Telephone Standards.

38.    Second, United Healthcare was not handling 97.5% of Customer Service Calls within 120 seconds, as required by the Telephone Standards.

39.    Moreover, the Q Cap installed by AT & T allowed for the generation of false reports.

40.    United Healthcare was able to and did report fraudulently that it handled 97.5% of calls incoming to the ARU within 120 seconds. United Healthcare also fraudulently reported that no more than 20 % of all incoming callers received busy signals.

41.    In February 1998, Koslick was replaced as manager of the Customer Service Department by Fedor.

8

42.    On or about March 10, 1998, Fedor sent an e-mail to the assistant manager of the Customer Service Department at United Healthcare, Marc Rosario, and asked for statistics concerning compliance with the Telephone Standards for Customer Service Calls. (See Exhibit "C" attached hereto.)

43.    Rosario's response reflected that United Healthcare was failing to meet the Telephone Standards, notwithstanding implementation of the Q Cap Fraud.

44.    At roughly the same time, HCFA representative Scott Greer contacted United Healthcare to inquire concerning complaints HCFA was receiving from suppliers and beneficiaries concerning the ARU "cutting calls off when it should be transferring 'em to a live body." (See Exhibit "D" attached hereto.)

45.    The HCFA inquiry received attention at the highest levels of United Healthcare, directed to the DMERC's director for Region A, Fred Larsen.

46.    Rosario reported in an e-mail to Fedor, his new boss, and Larsen, the ultimate boss, that United Healthcare was not in compliance with the Telephone Standards because of inadequate CSR staffing and because of the AT&T Q cap, which allow only 7 provider callers and 5 beneficiary callers to hold for a CSR, routing all others to a busy signal and then out of the system. (See Exhibit "E" attached hereto).

9

47.    Rosario explained that the Q Cap Fraud was in place so as to "control the volume" of provider and beneficiary calls going to CSRs. Rosario further explained in the e-mail that if the Q Cap Fraud restriction were removed, United Healthcare would have "an even larger problem with our percentage," meaning a more dramatic reflection of its failure to meet the Telephone Standards for Customer Service Calls.

48.    Fedor was disturbed by this information and immediately sought further information from Rosario and others in United Healthcare's Customer Service Department concerning the creation and implementation of the Q Cap Fraud. His colleagues were unwilling to provide such information.

49.    Accordingly, Fedor approached the director of United Healthcare's Information Services Department for information concerning the Q Cap. In an e-mail from the director dated March 25, 1998, Fedor learned that while a caller may arrive in the ARU, if that caller wants to hold, there could be a problem. In particular, the Information Services Department advised that if there are already 7 provider callers holding in the queue, the next caller will receive a busy signal and therefore have no option but to hang up. (See Exhibit "F" attached hereto.)

50.    Thereafter, Fedor approached AT&T and learned that AT&T had been instructed to create an automated call system whereby no more than 7 provider callers

and 5 beneficiary callers would be able to hold for CSRs with all callers thereafter

routed to a busy signal and out of the system. (See Exhibit "G" attached hereto.)

51.    Fedor then ran internal reports at United Healthcare designed to reflect

the initiation and magnitude of the Q Cap Fraud. The report of provider calls reflected

that the Q Cap Fraud had commenced in July 1997 and that, in March 1998 alone,

11,164 callers had come into the ARU only to be swept out to busy signals as a result

of the automated Q Cap Fraud.  The aggregate number of provider "Calls Forced

Busy" for the period from July 1997 through March 1998 was 25,663.  (See Exhibit

"H" attached hereto.)

52.    Similarly, an internal analysis relating to beneficiary callers reflected

that the Q Cap Fraud had commenced in July 1997 and that, in March 1998 alone,

15,505 callers had improperly and unlawfully received busy signals as a result of the

Q Cap Fraud.  The aggregate number of beneficiary "Calls Forced Busy" for the

period from July 1997 through March 1998 was 53,041. (See Exhibit "I" attached

hereto.)

53.    Fedor understood that the AT&T automated system generated for

United Healthcare reports and statistics reflecting compliance with the Telephone

Standards for Customer Service Callers when, in fact, United Healthcare had failed to

comply with those standards at any time since it became DMERC for Region A in

1996.

54.   Fedor notified the CSRs working for him of the Q Cap Fraud and

advised that he was going to order AT&T to remove the automated cap for callers

holding in provider and beneficiary queues. Fedor created a slide for an overhead

projector to demonstrate how the Q Cap Fraud System operated to restrict the number

of calls so that United Healthcare could fraudulently report to HCFA that is was

complying with the Telephone Standards. (See Exhibit "J" attached hereto.)

55.   Fedor also prepared for and presented to the CSRs a second slide

reflecting the dramatic increase of incoming calls that the CSRs should expect in the

absence of the Q Cap Fraud. (See Exhibit "K" attached hereto.)

56.   On April 7, 1998, Fedor placed an order with AT&T to remove the

automated Q Cap.  (See Exhibit "L" attached hereto.)

57.   Thereafter, United Healthcare's inability to comply with the

Telephone Standards became obvious and was accurately documented in internal

memoranda.

58.   Indeed, Fedor reported to his boss, DMERC Director Larsen, that for

fiscal year 1998, United Healthcare had handled 65.4% of provider calls and 69.6%

of Customer Service Calls within 120 seconds, far below the 97.5% standard. (See

Exhibit "M" attached hereto.)

59.    Likewise, 31.2% of provider calls and 26.3% of beneficiary calls were going to busy signals, far above the 20% Telephone Standards for ATB.

60.    By September 1998, the performance of Healthcare's CSRs had reached crisis proportions, with just 7.35 % of beneficiary calls and 11.15% of provider calls answered within 120 seconds.

61.    Fedor advised Larsen that United Healthcare could only remedy this crisis by adding at least 25 additional full-time employees to work as CSRs.

62.    Rather than correct these glaring deficiencies, Larsen embarked on a campaign to cover-up United Healthcare's fraudulent schemes.

63.    First, Larsen removed Fedor as manager of customer service and replaced him with Koslick, the mastermind of the earlier fraudulent telephone schemes.

64.    Second, Larsen and United Healthcare rejected hiring additional employees, but rather began pulling employees from other departments, such as claims processing, claims adjustments and appeals to work as CSRs.

65.    Third, in responding to HCFA inquiries concerning United Healthcare's decline in service standards, Larsen knowingly misrepresented the cause for this problem, blaming it entirely on the implementation of a new software system (VIPs) while knowingly omitting any disclosures concerning the Manual Release

13

Fraud, Q Cap Fraud or dramatic understaffing. (See Larsen memo to HCFA's Greer, attached hereto as Exhibit "N".)

66.   Moreover, United Healthcare's decision to cover-up its failure to comply with the Telephone Standards rather than correct it, resulted in a crisis gripping the Region A DMERC operations.

67.   By the fall of 1998, United Healthcare's decision to borrow employees from other departments to work as CSRs resulted in increased errors in claims processing and payment delays.

68.   In turn, basic claims processing errors were not adjusted accurately and promptly, leading to an increase in supplier claims, fair hearings and appeals.

69.   Medical Equipment suppliers reported having to wait as long as three hours to speak with CSRs and, once connected, were frequently advised that the DMERC would accept no more calls for that day.   (See Exhibit "O" attached hereto.)

70.   Claims processing problems had became so prevalent at United Healthcare that it was unable to present medical equipment suppliers with accurate information concerning the numbers and status of unpaid claims.

71.   Similarly, as a result of this fraudulent conduct, United Healthcare could not, and did not, meet Telephone Standards requiring prompt, clear and courteous responses to provider and beneficiary calls.

14

72.     Likewise, United Healthcare's fraudulent conduct may have begotten additional fraud since its failure to answer hundreds of thousands of calls between 1996 and 2000 undermined the effective functioning of its fraud unit.

73.     Further, United Healthcare's fraudulent conduct and its resultant cover-up of that conduct undermined HCFA's Contractor Performance Evaluation Process.

74.     On December 14, 1998, HCFA's Associate Regional Administrators advised United Healthcare of each of the fraudulent failings by United Healthcare catalogued above and demanded corrective action. (See Exhibit "P" attached hereto.)

75.     Ironically, just two weeks later, Fedor resigned from United Healthcare and, in his exit interview, set forth his understanding of the Q Cap Fraud and Manual Release Fraud. (See Exhibit "Q" attached hereto.)

76.     Upon information and belief, United Healthcare failed to share Fedor's exit interview questionnaire with HCFA, but rather continued to engage in fraudulent conduct and consistent cover-ups until it voluntarily withdrew as Region A DMERC in 2000.

## COUNT I – FALSE CLAIMS ACT,

### 31 U.S.C section 3729 (a)(1)

77.    Plaintiffs/Relators incorporate by reference paragraphs 1-76 of the Complaint as if set forth fully herein.

78.    Section 3729 (a)(1) provides that a violation of the False Claims Act occurs each time a party knowingly presents to the government a false or fraudulent claim for payment or approval.

79.    United Healthcare made false statements and engaged in a fraudulent course of conduct for each of the fiscal years 1997 through 2000 so as to obtain and then maintain by renewal its contract with HFCA to act as the Region A DMERC. The fiscal year ran from October 1 through September 30.

80.    United Healthcare knowingly misrepresented to HCFA that it could and would meet HCFA regulations, MCM guidelines and relevant SOWs for fiscal years 1997-2000 related to processing claims and providing customer services to DMEPOS.

81.    United Healthcare's fraudulent statements and course of conduct resulted in the government entering into four separate and successive contracts with United Healthcare between 1996-2000, and making payments to United Healthcare that would not have occurred but for United Healthcare's fraudulent statements and

16

conduct.

82.    United Healthcare's fraudulent statements and conduct and knowing and willful failure to meet its DMERC contract requirements and related regulatory standards have resulted in an injury and damages to the government in the full amount of the DMERC contracts for each fiscal year 1997-2000.

WHEREFORE, Relators/Plaintiffs respectfully request that this Court enter judgment in their favor and against United Healthcare; award damages trebled in favor of Relators/Plaintiffs and against United Healthcare; assess civil penalties in favor of Relators/Plaintiffs and against United Healthcare; award attorneys fees to Relators/Plaintiffs and provide such other relief as this Court deems just and proper.

## COUNT II – FALSE CLAIMS ACT

### 31 U.S.C. section 3729 (a)(2)

83.    Relators/Plaintiffs incorporate by reference paragraphs 1-82 of the Complaint as if set forth fully herein.

84.    Section 3729 (a)(2) provides that a violation of the False Claims Act occurs each time a party knowingly makes or causes to be made a false statement or record to get a false or fraudulent claim paid or approved by the government.

17

85. From 1996 to 2000 United Healthcare regularly made knowingly false statements and records concerning its compliance with HCFA regulations and MCM guidelines, including the Telephone Standards, so as to obtain and maintain by renewal its Region A DMERC contracts.

86. United Healthcare's fraudulent statements and records were used so that false or fraudulent claims would be paid by the government.

87. The government made DMERC Region A contract payments to United Healthcare between 1996 and 2000 in reliance on United Healthcare's knowingly false and fraudulent statements and/or records.

88. United Healthcare's false and fraudulent statements and records, and knowing and willful failure to meet its DMERC contract requirements and related regulatory standards, have resulted in an injury and damages to the government in the full amount of the DMERC contracts for each fiscal year 1997-2000.

WHEREFORE, Relators/Plaintiffs respectfully request that this Court enter judgment in their favor and against United Healthcare; award damages trebled in favor of Relators/Plaintiffs and against United Healthcare; assess civil penalties in favor of Relators/Plaintiffs and against United Healthcare; award attorneys fees to Relators/Plaintiffs; and provide such other relief as this Court deems just and proper.

## COUNT III

18

## **FRAUDULENT MISREPRESENTATION**

89.    Relators/Plaintiffs incorporate by reference paragraphs 1-88 of the

Complaint as if set forth fully herein.

90.    United Healthcare knowingly made false statements and records, and

engaged in fraudulent conduct so as to induce HCFA to enter into and renew

DMERC Region A contracts with United Healthcare from 1996-2000.

91.    United Healthcare's false statements and records were relied upon by

the government to its detriment.

92.    United Healthcare's false statements and records and fraudulent

conduct caused the government to award and renew its Region A DMERC contracts

with United Healthcare.

93.    United Healthcare knowingly and willfully failed to perform its

DMERC contract in accordance with applicable federal regulations, MCM guidelines

and relevant SOW provisions.

94.    The government has sustained an injury and suffered damages as a

result of United Healthcare's fraudulent statements, records and conduct.

WHEREFORE, Relators/Plaintiffs respectfully request that this Court

enter judgment in their favor and against United Healthcare; award damages,

including punitive damages, to Relators/Plaintiffs and against United Healthcare; and

award such further relief as this Courts deems just and proper.

## COUNT IV

## BREACH OF CONTRACT

95.    Relators/Plaintiffs incorporate by reference paragraphs 1-94 of the Complaint as if set forth fully herein.

96.    United Healthcare entered annual DMERC Region A contracts with the government between 1996 and 2000.

97.    United Healthcare was awarded the contracts by the government on the basis of its promises to comply with federal regulations, MCM guidelines and relevant SOW provisions.

98.    The government paid United Healthcare for its services.

99.    United Healthcare breached the DMERC Region A contracts by, <u>inter alia</u>, failing to meet the Telephone Standards, claims handling requirements, adjustments and appeals provisions and fraud unit specifications.

100.    The government sustained an injury and suffered damages as a result of these material breaches.

WHEREFORE, Relators/Plaintiffs respectfully request that this Court enter judgment in their favor and against United Healthcare; award damages to Relators/Plaintiffs and against United Healthcare; and award such further relief as this Court may deem just and proper.

Respectfully submitted,

Charles Kelly (Pa. I.D. 51942)
Barbara Scheib (Pa. I.D. 82584)
SINCLAIR JACKSON REINHART &
HAYDEN, LLC
501 Corporate Drive, Suite 200
Canonsburg, PA 15317
(724) 873-8660

Daniel T. Brier (Pa. I.D. 53248)
Donna A. Walsh (Pa. I.D. 74833)
MYERS, BRIER & KELLY, L.L.P.
425 Spruce Street
Scranton, PA 18501
(570) 342-6100

Brian J. Cali, Esquire (Pa. I.D. 26069)
103 E. Drinker Street
Dunmore, PA 18512
(570) 344-2029

Attorneys for Relators/Plaintiffs

Date:  November 21, 2001

21





**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Region III
Health Care Financing
Administration

Refer to:   DMC(54)

P.O. Box 7760
Mail Stop 13
Philadelphia, PA 19101

OCT 0 6 1997

*Copy ! Joe*
*Vick*
*Tom Kelly*
*Fred*

Fred Larsen
District Manager
United HealthCare
Durable Medical Equipment Regional Carrier - A
Post Office Box 6800
Wilkes-Barre, Pennsylvania 18773-6806

*File ! CP897 : SERDIG*

Dear Mr. Larsen:

Enclosed please find our review of United HealthCare's Durable Medical Equipment Regional Carrier (DMERC) customer service review for Fiscal Year 1997. Our review highlighted two service areas: telephone inquiries and written correspondence.

Our review was conducted in accordance with criteria outlined in Standard 2 of the Service Criterion of the DMERC 1997 review guide and in accordance with Section 5261.2, customer service criterion, of the Medicare Carriers Manual. Our review was conducted during the period July 28, 1997 - August 1, 1997. We appreciate the cooperation of your staff while completing our review.

United HealthCare - DMERC A has met HCFA's expectations for customer service. Please address the one program deficiency noted within our report. Should you or your staff have any questions, please feel free to contact Dan Robison of my staff at (215) 596-0680.

Sincerely,

Peter Goodman, Chief
Beneficiary Services Branch
Division of Beneficiaries,
Health Plans and Providers

Enclosures

# Contractor Performance Evaluation (CPE) Customer Service Criterion

## *Review of Telephone Service*
## *Review of Written Inquiries*

**Prepared for**
United HealthCare - Durable Medical Equipment Regional Carrier - A

**by**
Dan Robison, Health Insurance Specialist
Division of Beneficiaries, HealthPlans and Providers, Region III

September 22, 1997

For Fiscal Year 1997, in the customer service areas, we reviewed telephone service and written inquiries. The following report describes our review activities, findings and recommendations.

## Written Inquiries

We reviewed the written inquiries at United HealthCare(UHC) – Durable Medical Equipment Regional Carrier (DMERC). Our objectives were to review the written correspondence for accuracy, responsiveness, tone and clarity, and timeliness; and to ensure processes are in place to accurately receive, process, track and report UHC's written correspondence.

We selected a sample of 78 cases from the current universe of written responses for the period October 1, 1996 through July 22, 1997. Our sample consisted of 20 provider, 25 beneficiary, 15 Congressional, and 18 Medicare Secondary Payor (MSP) responses.

### Accuracy

We found that in all cases UHC provided an accurate response to the incoming request. The accuracy of their responses demonstrates a knowledgeable staff, well trained in Medicare rules and regulations.

### Responsiveness

We found UHC's replies to be responsive. We noted that UHC ensures all concerns are addressed and clearly and concisely explained.

### Tone and Clarity

UHC's correspondence was clearly written and employed an appropriate tone.

### Timeliness

UHC's responses for provider, beneficiary, and Congressional responses were timely. However, we noted that one third of the MSP responses were outside the thirty day time frame. We recommend that UHC employ a system to send an interim response in those cases where it appears the response will not be sent in thirty days.

## REPORTING INQUIRIES

During our visit we also reviewed the current processes for receiving, monitoring, tracking, and reporting of inquiries. We have the following observations:

Correspondence is received through the mail and via FAX. It is date stamped on the day of receipt and manually logged into the appropriate Congressional, provider, beneficiary or MSP

correspondence log book. Correspondence is closed out on the day the letters are sent. Because of the manageable volume of inquiries received, this system is adequate to accurately receive, track and report inquiries.

We also reviewed the processes in place in the mailroom to ensure proper date stamping. Processes are in place to ensure that the mailroom date stamps all correspondence on the day it is received.

## Telephone Inquiries

We evaluated UHC's telephone inquiries based on mandated review criteria outlined in Part 2 of the Medicare Carriers Manual (MCM), Sections 5104B and 5105B. Based on those requirements we learned the following aspects of UHC's telephone operations.

UHC provides continuous telephone service during their hours of operation which are 8:00 A.M. - 4:00 P.M., Monday through Friday. UHC employs an Automated Response Unit (ARU) which picks up all calls after the first ring. The ARU allows providers and beneficiaries to obtain the information they need and always provides an opportunity to speak with a representative.

UHC employs a toll-free service for their beneficiaries which can be accessed from anywhere in the United States. The providers utilize a toll number to access UHC.

Including supervisors and staff who generally handle written correspondence, UHC has 32 available telephone reps. They are evenly split between beneficiary and provider specialties, however, all reps are cross-trained to handle provider and beneficiary issues.

The telephone numbers are published in phone books (where possible), provider bulletins, pamphlets, flyers and Explanation of Medicare Benefits Statements.

For new employees, UHC tests incoming applicants to determine if they have a personality conducive to customer service activities. They also provide an intensive training regimen which includes Medicare guidelines, claims processing, correspondence, medical review, phone skills and sensitivity training.

On-the-job training consists of sitting with an experienced rep for as long as needed to ensure each representative is able to provider a quality customer service experience for the caller. For existing employees transferring into the telephone area, the training is tailored to meet their needs. Phone skills and sensitivity training are a must.

All Trunks Busy (ATB), 20 second pickup time, and the 120 second hold times are within the thresholds established by HCFA. UHC's call management system (CMS) captures the data. In an effort to

continually improve UHC is upgrading its CMS to allow for greater flexibility and data collection.

Monitoring of telephone reps is conducted by two supervisors. They monitor five to ten calls per rep per month. Nonperformance is shared with each rep. If appropriate, corrective action plans are utilized. We verified their use.

Proficiency tests are administered once a month in the form of a quiz. The results are analyzed to determine potential areas of additional training. If a question is consistently missed, reminder memos are distributed as a refresher training tool. All answers are shared with the staff.

Staff have access to numerous specialized employees to assist in completing calls. They have access to professional relations, medical review, nurses, and beneficiary coordinators.

UHC, where appropriate, makes fraud and abuse referrals. They are reviewed and subsequently sent to the home office for follow-up.

Call backs generated from normal operations are done the same day or the next morning. A call back sheet is completed documenting each call back.

UHC stresses the importance of the Privacy Act and continually reminds employs of criteria surrounding the release of confidential information. UHC's system allows for rep payees to be identified for possible release of information.

Each telephone representative possesses a terminal and an outgoing phone line which they can access without leaving their seats. The supervisor has a console which monitors telephone traffic by rep.

Employee performance ratings are a function of call volume and quality. Production standards exist; however, performance ratings only minimally take them into account. We cautioned UHC to ensure that reps do not rush callers off the phone, thus sacrificing quality for quantity.

We obtained copies of a proficiency tests, performance reviews, corrective action plans and call back sheets. UHC has met HCFA's expectations with its telephone service to beneficiaries and providers.

<u>Summary</u>

UHC has met HCFA's expectations with respect to customer service. It should be noted that UHC has made great strides in their customer service areas. They have embraced the customer service philosophy and their customer service product reflects

a commitment to continual improvement.  They continue to look for ways to improve.  UHC is utilizing much of the data collected to analyze operations and make efficient and effective changes.  We appreciate their commitment to continually provide high quality customer service to our Medicare customers.

We request that UHC address the program deficiency noted in this report.  Specifically, UHC must respond to the MSP inquiries within thirty days of receipt.


_Daniel P Corban_                _DBHPP - BSB_              _9/22/97_
Reviewer Signature              Branch                    Date



**UNITED HEALTHCARE REGION A DMERC**
**FY 1998 BUDGET AND PERFORMANCE REQUIREMENTS**
**CUSTOMER SERVICE PLAN**

---

## REGION A DMERC

CSP COORDINATOR:                          CSP ANALYST:

Vikki Menichillo, Operations Manager       Joe Koslick, Unit Manager, Customer Service
717-735-9507                               717-735-9470

## REQUIRED ACTIVITIES

- **All carriers must comply with MCM Sections 5104-5105**

  Written procedures are in place for handling correspondence and telephone inquiries.
  Measurement: Desk-top Procedural Manuals

  Computer reports can validate performance relative to the 120 second time frame as well as
  the All Trunk Busy Rate (ATB), answering calls within 20 seconds and number of calls
  received.
  Measurement: Each of our sites utilizes an AT&T Definity Call Management system that
  generates computerized reports on a daily, weekly and monthly basis

  A quality program is in place to ensure that correct information is provided and that clarity,
  responsiveness, tone and accuracy is observed.
  Measurement: 10 calls per CSR per month are reviewed, 5% of correspondence is reviewed,
  one proficiency test is given per month, call backs are reviewed and walk-ins are surveyed.

  Training is provided on a daily basis if needed and proficiency test are administered.
  Measurement: One proficiency test per month is administered.

  Call backs are made only when necessary, are tracked and are part of the quality program to
  ensure the regulations are followed.
  Measurement: A form is used to tickle call backs and ensure the call is returned.  A random
  sample of quality checks are performed on this form as well as calling the beneficiary to
  confirm the date of the call back.

  Privacy Act training is performed at a minimum on a yearly basis for established employees
  and is part of the training for new employees.
  Measurement: Each CSR signs off on the Privacy Act training log.  A record of the training is
  retained in each personnel file.

  Written procedures are in place for handling walk-ins.
  Measurement: Procedures are included in the Desk-top procedural manual.

---

- **Ensure that Medicare Handbooks are available and can be provided to beneficiaries upon request. All contractors should notify their RO of their supply needs.**

  Medicare Handbooks will be available at the DMERC contingent upon Regional Office allocation. Medicare Handbooks will be provided to beneficiaries upon request.  RO will be notified by the Customer Service Manager if additional materials are needed. Currently the DMERC has not received our supply of handbooks and will keep in contact with our Regional Office on this matter.

- **Implementation and ongoing operation of an inquiries analysis program. A current list of most frequently asked written and oral questions and areas of beneficiary concern/confusion should be maintained and updated on a monthly basis. Outreach and educational activities should be tailored to the current needs of beneficiaries as determined by the inquiries analysis program. Carriers should increase their efforts to partner with local groups and organizations, representing Medicare's diverse population, to increase the level of customer service to beneficiaries.**

  We have revamped our logging and tracking system in an effort to increase usefulness, to apply it to all facets of our field office organizations and to track each piece of non-claim mail, received in any format. The measurement of this system will be in the form of daily, weekly and monthly reports that will define for us in greater detail the who and why of each call or letter, volumes of inquiries and their location. This will enable us to have a much clearer picture of our typical beneficiary and why he/she is calling or writing. We will then take this information to develop training, outreach and partnering with various agencies. All of our sites have established connections with, or have been instrumental in the formation of liaisons, coalitions or organizations whose goal is to reach out to the beneficiary community in an effort to assist and educate. We will continue the use of our Call A Customer program that enables us to talk to a beneficiary about the service he/she received after contacting our office. Weekly reports are reviewed and analyzed by management in an effort to isolate patterns or trends. Annual reports are compiled showing the number of calls made, percentages of positive calls and challenges we were presented. It will include anecdotal comments and our efforts to assist those individuals who indicated their contact was less than satisfactory.

- **A plan to strengthen the quality of written and verbal correspondence with beneficiaries. Your plan should include an internal review process and activities to ensure that the quality of your communications with beneficiaries is continuously increasing.**

  As part of our documentation process and development of the desk-top procedural manuals, we have revamped and expanded our quality program. We have standardized our program for all sites and increased the number of calls and correspondence reviewed to the following:
  Measurement: 10 calls per person per month
  5% of correspondence
  1 proficiency test per month
  Random sample of call backs reviewed
  Surveys to each walk-in

- **Implement a developmental plan to meet the training needs of all staff, based on issues identified by surveys, focus groups and trend analysis.**

  Training is performed on a daily basis, if needed. Weekly staff meetings will continue to be utilized as training sessions to update customer service representatives on policy/procedure changes and to strengthen any weaknesses. Any change in law, regulation or policy is addressed and the CSRs are immediately trained. Our CS staff is also provided with advance copies of the news bulletins so that they can understand any change in policy that can result in denials and eventually inquiries from beneficiaries. As data is gleaned from our logging and tracking reports, this also will be evaluated to determine if training needs to be addressed. The Call A Customer program is also utilized as a means of identifying issues and trends.
  <u>Measurement</u>: Training logs will be retained for HCFA's review. These logs will show date trained, subject trained and signatures of attendees. Logging and tracking reports showing caller and reason for call will be analyzed for trends. These reports will be retained and compared against the previous months reports for changes in trends.

- **Develop open communication with staff at all levels in your organization to encourage the development of creative ideas for improving customer service and the Medicare program in general. All staff should be encouraged to feed their ideas and suggestions to upper management for service/program improvements. An internal process should be put in place whereby those ideas are acknowledged and considered. Ideas for improvements that are deemed unique and cost effective should be shared with appropriate RO staff for potential national implementation.**

  Government Operations has an Employee Suggestion Plan that enables employees to submit suggestions for improving customer service, cost reduction and ways to improve efficiency. All suggestions are acknowledged and tracked through the investigation process. Those suggestions that offer savings in dollars or increase in efficiency are shared with all sites and the individual that made the suggestion is rewarded. All employees at all sites are encouraged to make suggestions.
  <u>Measurement</u>: All suggestions are tracked by the suggestion committee. Potential dollars saved or time saved is evaluated by the suggestion committee.

  Customer Service Representatives are involved in office-wide "group think" meetings such as Shared Directive Work Group (SDWG) and Commlink. These groups will continue to promote open communications with staff at all levels through weekly staff meetings where representatives from all units, at all levels are in attendance. This includes the gathering and distribution of all pertinent information to the Customer Service Unit. In order to continually improve our service to our customers and produce a more consistent product, a new initiative has been implemented. Product/Process Focus Groups combine like products into 6 specialized categories thus producing more consistent outcome. This exciting initiative will continue through FY 98. Meeting minutes are distributed to all employees as well as a monthly P/PFG newsletter which contains specific information on each category. Ideas that may enhance productivity are submitted to the DMERC suggestions committee. If the proposal is accepted and implemented, rewards and recognition are given to the originator of the idea. Any enhancements are subsequently forwarded to the Regional Office for further development. The Customer Service Manager will provide immediate recognition and rewards to Customer Service Representative whose activities significantly enhance productivity of the unit and increase the quality of customer service.

- **Support of ongoing Consumer Information Strategy (CIS) Initiatives and Operation Restore Trust Initiatives, e.g., printing flu shot messages on the Explanation of Medicare Benefits (EOMB) or Medicare Summary Notice, Informational pamphlets detailing coverage of mammography, etc. Support should also include identifying the provider network and disseminating informational pamphlets/beneficiary information through that network.**

We at the Region A DMERC do not handle the processing of claims dealing with flu shots or mammograms. Therefore, our call volume of these inquiries are very low. However, messages to these initiatives are incorporated on EOMBs and the calls we received are directed to local carriers. We will continue to be actively involved in the dissemination of information to the beneficiary community, relative to DME issues. This is accomplished through workshops attended in conjunction with the State Departments on Aging and Beneficiary Liaison Council meetings. Various handouts are presented with information pertaining to current situations, policy changes and DMERC updates. All Beneficiary Advocacy organizations are placed on a mailing list to receive informational updates, such as newsletters, bulletins, etc. Beneficiary handouts will continue to be distributed at supplier seminars to update suppliers on matters that affect beneficiary reimbursement. This information will be given for comment to ensure that future updates address all issues. Semi-annual surveys will continue to be distributed to the supplier community requesting information on beneficiary concerns.

- **A detailed plan to identify, meet with, and inform beneficiary counseling and assistance groups on an ongoing basis. Topics of discussion should include current Medicare program information, methods to better educate Medicare beneficiaries on current policies, coverage issues and other items as identified by your inquiries analysis program. In addition, meetings should be tailored to the needs and requests of the group. Again, a free flow of information should be encouraged and suggestions for improvements to customer service should be considered and made known to appropriate RO staff.**

The DMERC will continue to schedule meetings with the State Departments on Aging to address beneficiary concerns. This includes the training of Department on Aging counselors on issues relative to DMERC and Medicare. Educational materials are provided and can be retained for reference at a future date. These materials will continue to be forwarded to workshops when the DMERC is not able to attend. A detailed contact sheet is included in the package which lists departmental contacts, phone numbers and mailing addresses. Comments from the Departments on Aging are encouraged to tailor future training materials and workshops to beneficiaries needs and expectations. Training materials will continue to be sent to the Regional Office for review and comment. Regional Office representatives will be invited to attend future workshops.

- **Actively seek to participate in local seminars, conferences and speaker bureaus to share current Medicare information, e.g., latest law changes, benefits covered by Medicare, the appeals process, explanation of and uses for Medicare benefit notices, etc.**

The DMERC will continue to actively participate in local seminars, conferences and State Department of Aging meetings. In the beginning of FY 98 letters, will be sent to these agencies offering our services to all Beneficiary Liaison Groups and State Department of Aging Associations.

- **Support Increased use of Audio Response Units (ARU). Activities that should be considered include printing and distributing an ARU operating guide, monitoring the performance/call volume of the ARU, updating ARU scripts to address areas of beneficiary confusion as determined by your inquiries analysis program, among others.**

  We are in the process of upgrading our ARU. The script of the ARU has been simplified to make it easier for the beneficiary to understand and easier to use. The updated equipment will allow the beneficiary to not only check the status of a claim but to obtain a copy of the Medicare Handbook, duplicate Explanation of Medicare Benefits and a Medpard Directory.

- **Incorporate initiatives designed to increase customer service levels for blind/deaf/disabled and any other vulnerable population of Medicare beneficiaries. Activities that should be considered include producing pamphlets explaining Medicare coverage of services for disabled beneficiaries, ongoing meetings with organizations that serve the disabled, and installation of a TDD line to service deaf beneficiaries, among others. Carriers should increase their efforts to partner with local groups and organizations, representing Medicare's diverse population, to increase the level of customer service to beneficiaries.**

  We will continue to work with organizations that serve the disabled. We will continue to have available a TDD machine for the hearing impaired, and a Hearing Aid compatible phone. The TDD number will be distributed through the handouts at beneficiary outreach. The DMERC has contacted an organization who can supply, on short notice, publications in braille. We will continue to initiate outreach activities with PROs, State Departments of aging and Beneficiary Liaison Councils., and will aggressively pursue the coordination of outreach and educational activities with congressional offices within the Region A area. These aggressive outreach initiatives clearly demonstrate our commitment to continue to provide exceptional customer service.

- **Carriers serving areas with high concentrations of non-English speaking beneficiaries should incorporate initiatives designed to increase customer service levels to those populations. Activities that should be considered include printing and distributing Medicare information in native languages, as appropriate, based on the needs of local communities and utilizing bilingual staff to conduct educational and informative seminars on Medicare topics.**

  We have incorporated initiatives designed to increase customer service levels to non-English speaking Beneficiaries. Our Customer Service unit has one Spanish speaking individual to assist with Spanish speaking callers and a voicemail box for Spanish calls to be transferred to if no one is available at that time. The DMERC also has a back-up Customer Service Representative in the Richmond Virginia Office to assist when necessary. We are looking into acquiring additional Customer Service Representatives that are bilingual in order to assist with the non-English speaking population. We also have a supply of HCFA publications written in Spanish.

- **Carriers should incorporate home health education into ongoing outreach efforts. Partnering with local fiscal intermediaries should be considered to ensure maximum outreach coverage in the beneficiary community.**

  The DMERC will continue it's pursuit to participate in local fiscal intermediaries meeting. The DMERC has requested the Region A State Supplier Associations to assist with the coordination of meetings with home health agencies and discharge planner organizations.





Daniel M Fedor
03/10/98 09:08 AM

To:      Daniel M Fedor/PA/UNH@UNITEDhealthcare
cc:
Subject: Re: Percentages: the what's, who's, when's, where's & why's 📧

Marcos Rosario

Marcos Rosario
03/10/98 08:17 AM

To:      Daniel M Fedor/PA/UNH@UNITEDhealthcare
cc:      HMDAVIS AT TEMS@UHCGWY@UNITEDhealthcare
Subject: Percentages: the what's, who's, when's, where's & why's

Dan:
          Here are the Bullets you asked for.


- **Percentages for Beneficiary Services for 10/97**          **98.52%**
- **Percentages for Beneficiary Services for 11/97**          **98.85%**
- **Percentages for Beneficiary Services for 12/97**          **97.13%**
- **Percentages for Beneficiary Services for 01/98**          **95.51%**
- **Percentages for Beneficiary Services for 02/98**          **88.97%**


- Beginning in the month of October 1997 Beneficiary Services was staffed with 15 full-time CSR's allowing the department to handle the volume of calls received within the first 2 months of fiscal year 1997. It should be noted that 3 out of the 15 representatives were new hires, and still in training during the months of October and November. The month of December was the first month they were officially considered CSR's.
- In the month of December 1997 Beneficiary Services lost 2 CSR's, Nancy Kinney who was on of our most experienced representatives due to VIPS, and Paul Winarski who resigned. This resulted in a lower percentage in comparison to those of previous months.
- In the month of January 1998 along with the loss of 2 CSR's, Beneficiary Services was further weakened by excessive absences. This also included absences resulting from FMLA, of which Beneficiary Services has 5 full-time CSR's certified
- In the month of February 1998 we lost a third CSR, in addition to the excessive absences, FMLA, and the 2 CSR's which we lost earlier in the year.
- Selected representatives were also required to participate in regularly scheduled P/PFG meetings. In order for them to participate in these meetings, which usually lasted about an hour. They needed to be off the phones which many times were during peak call times.
- In summary, from October to November Beneficiary Services was staffed sufficiently to

handle the volume of calls received at that time. However, as the months of December and February came about, we lost the foundation of the department. 3 full-time CSR's were lost, 5 representatives who were, and actively are using FMLA benefit, absences, and regularly scheduled vacations all contributed to the decline of CPEP percentages.

- Attendance records are currently available for the months of December thru February.

| | |
|---|---|
| • **Percentages for Provider Services for 10/97** | **98.34%** |
| • **Percentages for Provider Services for 11/97** | **98.49%** |
| • **Percentages for Provider Services for 12/97** | **96.64%** |
| • **Percentages for Provider Services for 01/98** | **95.99%** |
| • **Percentages for Provider Services for 02/98** | **87.09%** |

- Beginning in the month of October 1997 Provdier Services was staffed with 15 full-time CSR's allowing the department to handle the volume of calls received within the first 2 months of fiscal year 1997. It should be noted that 4 out of the 15 representatives were new hires, and still in training during the months of October and November. The month of December was the first month they were officially considered CSR's.

- In the month of December 1997 Provider Services lost 1 CSR, Marita Gilski who resigned. As a result, due to the resignation, absences, and regularly scheduled vacations, CPEP percentage's suffered comparison to those of previous months. In addition, one of our most experienced representatives was frequently absent due to personal problems.

- In the month of January 1998 Provider Services lost 3 additional CSR's, Linda Pimble, and Sue Bauer, both of who resigned. Also Michelle Knorek, who is one of our more experienced representatives was out on STD. This left us with 12 CSR's, 2 of which had recently come off of training.

- In the month of February 1998 we lost a fourth CSR, Wanda Ryniec, who was another one of our more experienced representatives due to FMLA. Unfortunately, this representative will not be returning to Telephone Services after her FMLA leave.

- Selected representatives were also required to participate in regularly scheduled P/PFG meetings. In order for them to participate in these meetings, which usually lasted about an hour. They needed to be off the phones which many times were during peak call times.

- In summary, from October to November Provider Services was staffed sufficiently to handle the volume of calls received at that time. However, as the months of December and February came about, we lost a solid portion of the department. 4 full-time CSR's were lost, 1 representatives who was and currently is using STD benefit, absences, and regularly scheduled vacations all contributed to the decline of CPEP percentages.

- Attendance records are currently available for the months of December thru February.



DAN



821

Please forward response and copy of TM to the Traffic Management mail bin to b_____ ___t ___to report by Mary Thompson

## Traffic Management Intake Record

Date Received: 3/19/98

Received By: Mary m Thompson

Transmission Method: Internet

Source of Document: HCFA

Document Originator: Scott Greer

Internal Process Owner: Fede Dave   3/19/98

Subject: ARU Problems

| Action Item(s): | Action Owner(s): | Internal Due Date: |
|---|---|---|
| | DAN | 3-20-98 |

External Due Date: 3/20/98

Close Date: _____

Copies:
Dan
Vic
Fred

**Scott Greer, 03:33 PM 3/18/98 , ARU**

Return-Path: <SGreer@hcfa.gov>
Date: Wed, 18 Mar 1998 15:33:05 -0500
From: Scott Greer <SGreer@hcfa.gov>
To: DMERCA@ix.netcom.com
Subject: ARU

Is there a problem with your ARU?  I'm getting complaints that the ARU is
cutting folks off when it should be transferring 'em to a live body.  & nobody
is answering the 7383 number.









Victoria A Menichillo
03/13/98 12:17 PM

To:      Daniel M Fedor/PA/UNH@UNITEDhealthcare
cc:
Subject: Supplier Concerns regarding disconnects

**Would like to discuss with you**
**Vik**

--------------------- Forwarded by Victoria A Menichillo/PA/UNH on 03/13/98 12:27 PM ---------------------

Marcos Rosario
03/12/98 03:10 PM

To:      Frederic C Larsen/PA/UNH@UNITEDhealthcare
cc:      Daniel M Fedor/PA/UNH@UNITEDhealthcare, MHEALEY1 AT TEMS@UHCGWY@UNITEDhealthcare,
         ACAPECE AT TEMS@UHCGWY@UNITEDhealthcare, TOCONNO2 AT
         TEMS@UHCGWY@UNITEDhealthcare, Doris M Spencer/CT/UNH@UNITEDhealthcare, EGROBLEW AT
         TEMS@UHCGWY@UNITEDhealthcare, LVIOT AT TEMS@UHCGWY@UNITEDhealthcare, KQUAGLIA
         AT TEMS@UHCGWY@UNITEDhealthcare, PKOMISHO AT TEMS@UHCGWY@UNITEDhealthcare,
         Victoria A Menichillo/PA/UNH@UNITEDhealthcare, HMDAVIS AT
         TEMS@UHCGWY@UNITEDhealthcare
Subject: Supplier Concerns regarding disconnects

Fred,
        I just wanted to make you aware of the suppliers concerns regarding the busy signals and
the disconnects they are receiving. Briefly this is the reasons they are having these problems.

1)      Telephone Services is not sufficiently staffed
2)      Once all the reps are on the line with a customer, only 7 callers are allowed to hold due
to the que length.
3)      More suppliers calling for CSR's than are available.


        The reason there are only 7 callers allowed to hold for a CSR is in order to control the
volume that can be handled by them. After 7 callers are holding for a CSR, additional callers may
access the ARU. However, if these callers opt for a CSR, they will receive a busy disconnect since
the que is full. If we were to make any changes to the que length, increase or decrease, it would
create an even larger problem with our percentages. Presently we have managed to raise our
percentage in the 80's and sometimes even the 90's in the past few days. Our ATB has suffered
somewhat, but not as in the past months. Unfortunately, until we are adaquetly staffed this will
continue to be a problem, and the best thing to advise any callers is to continue calling back.
Hopefully it wont be an issue in the near futuer.

                                              Marc



Daniel M Fedor
03/25/98 02:51 PM

To:      Shirel Thomas/MetraHealth@UNITEDhealthcare
cc:
Subject: Caller Diconnects (CS line)

Shirel,

Situation:

A customer calls provider line.  The caller is **ACCEPTED** into the ARU.  The caller uses the ARU and
then wants to speak with a CSR.  If there are already 7 callers holding (in queue) the caller will
receive a brief busy signal and then be disconnected.


Request:

**How many callers have been disconnected due to us retricting the amount  that can wait in queue
for the past 6 months?**

thanks
Dan



# AT&T Solutions GCSC

# FAX

Date: *1 APR 98*

Number of pages including cover sheet: _____

To: *Dan Fedor, UHC*

From: *Tori Richardson*

Phone: _____

Fax phone: _____

CC: _____

Phone: *1-800-731-2838*

Fax phone: 919-731-2904

REMARKS:  ☐ Urgent   ☑ For your review   ☐ Reply ASAP   ☐ Please comment

0145

```
display vector 1 print                   04/01/98 16:18  Page   1 of   3
                            CALL VECTOR
 Number: 1                  Name Provider-split
     Basic? y    EAS? n    G3V4 Enhanced? y    ANI/II-Digits? y   ASAI Routing? n
 Prompting? y    LAI? n    G3V4 Adv Route? y       CINFO? n
 01 goto          step   12   if time-of-day    is all 16:00 to all 08:00
 02 goto          step   12   if time-of-day    is fri 16:00 to mon 08:00
 03 goto          step   20   if calls-queued   in split 1     pri m >  7
 04 goto          step   13   if staffed-agents in split 70          >  0
 05 goto          step   14   if staffed-agents in split 1      <  1
 06 queue-to      main split 1    pri m
 07 wait-time     2    secs hearing ringback
 08 announcement  7101
 09 wait-time     30   secs hearing music
 10 announcement  7102
 11 goto          step   9    if unconditionally


display vector 1 print                   04/01/98 16:19 Page   2 of   3
                            CALL VECTOR
 12 disconnect    after announcement 7107
 13 disconnect    after announcement 7109
 14 disconnect    after announcement 7109
 15
 16
 17
 18
 19
 20 busy
 21
 22
display vector 1 print                   04/01/98 16:19 Page   3 of. 3
                            CALL VECTOR
 23
 24
 25
 26
 27
 28
 29
 30
 31
 32
```

display vector 2 print

CALL VECTOR                    04/01/98 16:20 Page    1 of    3

```
 Number: 2                Name Bene. Split 2
     Basic? y     EAS? n   G3V4 Enhanced? y   ANI/II-Digits? y   ASAI Routing? n
  Prompting? y    LAI? n   G3V4 Adv Route? y       CINFO? n
 01 goto        step   12  if time-of-day    is all 16:00 to all 08:00
 02 goto        step   12  if time-of-day    is fri 16:00 to mon 08:00
 03 goto        step   20  if calls-queued   in split 2   pri m >  5
 04 goto        step   13  if staffed-agents in split 70        > 0
 05 goto        step   14  if staffed-agents in split 2         < 1
 06 queue-to    main split 2   pri m
 07 wait-time    2    secs hearing ringback
 08 announcement 7101
 09 wait-time   30    secs hearing music
 10 announcement 7102
 11 goto        step   9   if unconditionally
```

display vector 2 print

CALL VECTOR                    04/01/98 16:20 Page    2 of    3

```
 12 disconnect  after announcement 7107
 13 disconnect  after announcement 7109
 14 disconnect  after announcement 7109
 15
 16
 17
 18
 19
 20 busy
 21 stop
 22
```

display vector 2 print

CALL VECTOR                    04/01/98 16:20 Page    3 of   3

```
 23
 24
 25
 26
 27
 28
 29
 30
 31
 32
```



PROVIDER

Monthly VDN Report

VDN: 7000

Printed: 4/ 1/98 4:47 PM
ACD: UNITED HEALTH_ACD1

| Month Starting | Vector No. | Calls Offered | VDN Flow In | Calls Ans | Avg Speed Ans | Avg Talk Time | Avg After Call | Calls Ans in Main | Calls Ans in Backup | Other Calls Connect | Avg Connect Time | Calls Aban | Avg Aban Time | Calls Forced Busy | Calls Forced Disc | VDN Flow Out | Avg Time in VDN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals: | | 566481 | 9177 | 481628 | :39 | 2:20 | :11 | 480519 | 1109 | 0 | | 35946 | :51 | 25663 | 22948 | 296 | 2:38 |
| 3/ 1/97 | 1 | 41941 | 693 | 36098 | :34 | 2:26 | :13 | 35515 | 583 | 0 | | 2792 | 1:09 | 0 | 3050 | 1 | 2:42 |
| 4/ 1/97 | 1 | 42827 | 315 | 38581 | :31 | 2:21 | :10 | 38055 | 526 | 0 | | 2640 | 1:25 | 0 | 1605 | 1 | 2:42 |
| 5/ 1/97 | 1 | 41403 | 200 | 37485 | :26 | 2:14 | :08 | 37485 | 0 | 0 | | 2434 | 1:43 | 0 | 1321 | 163 | 2:33 |
| 6/ 1/97 | 1 | 42826 | 3893 | 38173 | :29 | 2:15 | :07 | 38173 | 0 | 0 | | 3152 | 2:04 | 0 | 1501 | 0 | 2:37 |
| 7/ 1/97 | 1 | 44496 | 289 | 39206 | :33 | 2:17 | :08 | 39206 | 0 | 0 | | 3270 | 1:38 | 250 | 1770 | 0 | 2:39 |
| 8/ 1/97 | 1 | 42898 | 952 | 37712 | :36 | 2:16 | :07 | 37712 | 0 | 0 | | 2721 | :18 | 1254 | 1211 | 0 | 2:34 |
| 9/ 1/97 | 1 | 41652 | 282 | 36323 | :37 | 2:17 | :10 | 36323 | 0 | 0 | | 2720 | :18 | 1231 | 1378 | 0 | 2:35 |
| 10/ 1/97 | 1 | 45400 | 371 | 41227 | :27 | 2:21 | :16 | 41227 | 0 | 0 | | 2334 | :14 | 631 | 1192 | 16 | 2:36 |
| 11/ 1/97 | 1 | 38474 | 300 | 33807 | :27 | 2:24 | :12 | 33807 | 0 | 0 | | 2045 | :14 | 425 | 2176 | 21 | 2:33 |
| 12/ 1/97 | 1 | 44661 | 518 | 37594 | :39 | 2:23 | :10 | 37594 | 0 | 0 | | 2637 | :17 | 1757 | 2641 | 32 | 2:37 |
| 1/ 1/98 | 1 | 44260 | 333 | 37641 | :44 | 2:20 | :12 | 37641 | 0 | 0 | | 2851 | :18 | 2046 | 1669 | 53 | 2:40 |
| 2/ 1/98 | 1 | 45086 | 481 | 33681 | 1:05 | 2:17 | :14 | 33681 | 0 | 0 | | 2986 | :27 | 6305 | 1510 | 4 | 2:36 |
| 3/ 1/98 | 1 | 50557 | 550 | 34100 | 1:25 | 2:31 | :14 | 34100 | 0 | 0 | | 3364 | :35 | 11164 | 1924 | 5 | 2:46 |



BENE

Monthly VDN Report

VDN: 7001

Printed: 4/ 1/98  4:51 PM
ACD: UNITED_HEALTH_ACD1

| Month Starting | Vector No. | Calls Offered | VDN Flow In | Calls Ans | Avg Speed Ans | Avg Talk Time | Avg After Call | Calls Ans in Main | Calls Ans in Backup | Other Calls Connect | Avg Connect Time | Calls Aban | Avg Aban Time | Calls Forced Busy | Calls Forced Disc | VDN Flow Out | Avg Time in VDN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Totals: | | 591633 | 18884 | 427945 | :43 | 2:26 | :11 | 425524 | 2421 | 0 | | 22295 | 3:14 | 53041 | 28201 | 151 | 2:45 |
| 3/ 1/97 | 2 | 38524 | 347 | 33754 | :46 | 2:37 | :16 | 32133 | 1621 | 0 | | 960 | 3:44 | 0 | 3808 | 2 | 3:08 |
| 4/ 1/97 | 2 | 36289 | 119 | 33422 | :42 | 2:32 | :12 | 32622 | 800 | 0 | | 1257 | 11:00 | 0 | 1607 | 3 | 3:24 |
| 5/ 1/97 | 2 | 35230 | 8 | 31660 | :38 | 2:22 | :12 | 31660 | 0 | 0 | | 1798 | 15:13 | 0 | 1651 | 121 | 3:31 |
| 6/ 1/97 | 2 | 38231 | 3109 | 32321 | :28 | 2:15 | :11 | 32321 | 0 | 0 | | 4108 | 2:49 | 0 | 1801 | 1 | 2:38 |
| 7/ 1/97 | 2 | 40868 | 52 | 34635 | :40 | 2:21 | :12 | 34635 | 0 | 0 | | 1566 | 7:11 | 2482 | 2184 | 1 | 2:53 |
| 8/ 1/97 | 2 | 41768 | 863 | 33823 | :46 | 2:23 | :09 | 33823 | 0 | 0 | | 826 | :33 | 5749 | 1370 | 0 | 2:40 |
| 9/ 1/97 | 2 | 41328 | 26 | 33870 | :45 | 2:25 | :09 | 33870 | 0 | 0 | | 801 | :32 | 4738 | 1919 | 0 | 2:42 |
| 10/ 1/97 | 2 | 40194 | 64 | 35952 | :30 | 2:30 | :16 | 35952 | 0 | 0 | | 802 | :29 | 2277 | 1350 | 13 | 2:46 |
| 11/ 1/97 | 2 | 46817 | 13887 | 34739 | :28 | 2:04 | :08 | 34739 | 0 | 0 | | 7184 | :11 | 2611 | 2280 | 3 | 1:58 |
| 12/ 1/97 | 2 | 38758 | 152 | 31150 | :40 | 2:35 | :03 | 31150 | 0 | 0 | | 591 | :29 | 3961 | 3032 | 4 | 2:42 |
| 1/ 1/98 | 2 | 40675 | 5 | 32443 | :47 | 2:33 | :07 | 32443 | 0 | 0 | | 768 | :35 | 5129 | 2334 | 1 | 2:47 |
| 2/ 1/98 | 2 | 42368 | 189 | 28858 | 1:04 | 2:27 | :10 | 28858 | 0 | 0 | | 801 | :42 | 10569 | 2138 | 2 | 2:33 |
| 3/ 1/98 | 2 | 50583 | 63 | 31318 | 1:16 | 2:31 | :05 | 31318 | 0 | 0 | | 1033 | :48 | 15505 | 2727 | 0 | 2:32 |





INCOMING CALL



ARU





Q

MAXIMUM ALLOWED IN Q
PROVIDER    = 99
BENE        = 99

CSR



```
** TX CONFIRMATION REPORT **        AS OF  APR 06 '98 16:11   PAGE.01

                                              UHC DMERC A


        DATE TIME       TO/FROM      MODE   MIN/SEC  PGS   CMD#  STATUS
  12    04/06 16:10 18007312904      EC--S  01'02" 004   078   OK
```

**UNITEDhealthcare**
60 East Main Street
Nanticoke, PA 18634

# Fax Cover Sheet

**DATE:**    April 6, 1998          **TIME:**    3:10 PM

**TO:** BRIAN GOULD               **PHONE:**
                                   **FAX:**

**FROM:**   Daniel Fedor          **PHONE:**  717-735-9410
            UNITEDhealthcare      **FAX:**    717-735-9442
            MANAGER, PROFESSIONAL RELATIONS
            REGION A DMERC

**RE:**

**Number of pages including cover sheet: 4**

**Message**
Attached is the work order for the Customer Servvice split (1, 2).


Thanks for all your help!

Dan

# UNITEDhealthcare HELP & MANAGEMENT

## TELEPHONE WORK ORDER REQUEST

### FAX TO (800) 731-2904

TICKET NUMBER _____

REQUESTER: Dan Fedor
WORK ORDER LOCATION: Nanticoke, PA
ACCOUNTING CODE: 3010  6250

ENTITY   LOCATION   FUNCTION

PHONE: 717 735 9410
CITY/STATE: Nanticoke, PA  DATE: 4-6-98
REQUESTED COMPLETION DATE/TIME: 4-6-98 4:30pm

| USER NAME | PHONE TYPE | EXTENSION | ADD | CHNG | MOVE | REASSIGN TO | DELETE | VOICE MAIL | RESET PSWRD | AT - FROM LOC/JACK | TO - NEW LOC/JACK |
|-----------|-----------|-----------|-----|------|------|-------------|--------|-----------|-------------|--------------------|--------------------|
| 1 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |
| 2 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |
| 3 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |
| 4 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |
| 5 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |
| 6 | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | | |

ADDITIONAL INFORMATION / INSTRUCTIONS:

Remove Q cap for vector 1, 2 (split 1, 2)
increase Q size to 99 or MAX for both splits

AUTHORIZED SIGNATURE (UHC telephone on-site contact): _[signature]_ (required)

| For UHC H&M Internal Use | Call Back Code _____ | Completed Date _____ |



# FY '99 Budget Performance Requirements

*Customer Service (Line 3)*
*Professional Relations (Line 4, 11)*

## LINE 3 - BENEFICIARY/PROVIDER INQUIRIES

## Workload

Current FTE(s)          34

Additional FTE(s)       25

**Total FTE(s) required**
**for FY '99            59**

Additional FTE(s) REQUIRED (BPRs for 'FY 99)

* Minimum performance objective of 1100 calls per FTE per month
(@ 55 calls per CSR per day - based on average of 3200 call per day)

* 97.5% or more telephone calls answered within 120 seconds; with no
less than 80% being answered within the first 60 seconds

* Contractors should meet or exceed their FY 1998 reported annual All
Trunk Busy (ATB) Rate.  As HCFA moves to improve its
Telephone Customer Service delivery, this rate is expected to
continue to decrease in the future towards the eventual **rate of zero**

* Report average talk time, targeting for the monthly call durations
between 3 and 7 minutes (180-420 seconds).

= **58 FTE**

\* Measure the quality of the service continuously, ensuring that all telephone agents are monitored for quality call handling and order processing on at least a quarterly basis for accuracy, knowledge, responsiveness, clarity, courtesy, tone, etc. The recommended sample of Quality Control observations is **10 calls per _quarter_**. In cases where sub standard performance is observed, it is recommended that the sample size be doubled to identify improvement opportunities and followed with corrective action.
**\*UHC (Gov't Ops) policy - 10 calls per _month_ per CSR**

\* Survey customers to determine their level of satisfaction with the telephone customer service they received, targeting an approval rating of 95% or higher. "Approval" generally corresponds to responses indicating that the customers expectations were either met or exceeded. Not greater than 5% of the responses should indicate dissatisfaction. **The recommended survey responses of not less than 400 callers per quarter.**

≈ 1 FTE


# LINE 4 PROVIDER EDUCATION AND TRAINING

\* Quarterly Newsletter/Supplier Manual

Four newsletters, four Supplier Manual revisions (10% of which is allocated to line 11) **(Tricia provided this to you)**

Educational support material (handouts for provider, physician and beneficiary education) **(Tricia provided this to you)**

For a more detailed examination of our planned activities relative to this line of operation in FY 1999, please refer to the Provider and Customer Service Plans.

To accomplish our aggressive Provider Education and Training goals, we will require the following staffing levels:

Direct     **10.00 FTE (6 Ombudsmen, 2 Communication/mailing specialists, 2 service assistants)**

## CPE Waiver Request

**CPE Standard: Customer Service** - Provide a toll free line available for beneficiaries and a toll line for Providers.  Provide a written response to all correspondence and congressional inquiries.  Provide information requested through Freedom of Information Act.

**Required performance level:** (Provider, Beneficiary, Congressional) -

Answer 97.5% of all calls within 120 seconds.
All Trunks Busy (ATB) less than or equal to 20%.
Provide a written response to all correspondence within 30 days

**Year to date performance level:**

| Performance level(10/1/97-9/16/98) - Provider | | Beneficiary (Toll Free) | Local |
|---|---|---|---|
| % within service level (120 sec) | 65.4 | 69.6 | |
| ATB% | 31.2 | 26.3 | 13.40 |
| Correspondence | | | |

**Monthly achievement levels from October 1997:**
% within service level - **Beneficiary**

| | | | |
|---|---|---|---|
| OCT: 98.52 | JAN: 95.51 | APR: 78.5 | JUL: 61.08 |
| NOV: 98.85 | FEB: 88.97 | MAY: 53.66 | AUG: 41.67 |
| DEC: 97.13 | MAR: 83.77 | JUN: 29.69 | SEP: 7.35 |

**Monthly achievement levels from October 1997:**
% within service level - **Provider**

| | | | |
|---|---|---|---|
| OCT: 98.34 | JAN: 95.99 | APR: 76.16 | JUL: 22.97 |
| NOV: 98.49 | FEB: 87.09 | MAY: 64.95 | AUG: 14.75 |
| DEC: 96.64 | MAR: 76.29 | JUN: 42.43 | SEP: 11.15 |

**Monthly achievement levels from October 1997:**
ATB - **Beneficiary**

| | | | |
|---|---|---|---|
| OCT: 7.97 | JAN: 15.74 | APR: 12.21 | JUL: 36.11 |
| NOV: 10.45 | FEB: 17.19 | MAY: 18.20 | AUG: 38.68 |
| DEC: 11.20 | MAR: 20.90 | JUN: 59.30 | SEP: 68.07 |

**Monthly achievement levels from October 1997:**
**ATB - Provider**

| | | | |
|---|---|---|---|
| OCT: 10.03 | JAN: 17.66 | APR: 29.70 | JUL: 48.77 |
| NOV: 17.91 | FEB: 22.51 | MAY: 36.65 | AUG: 7.18 * |
| DEC: 18.92 | MAR: 33.22 | JUN: 57.76 | SEP: 73.67 |

* From 8/1 - 8/27 CMS was not accurately recording % of ATB

**Monthly achievement levels from October 1997:**
**Correspondence % within 30 days - Beneficiary and Provider**

| | | | |
|---|---|---|---|
| OCT: 100 | JAN: 100 | APR: 100 | JUL: 0 |
| NOV: 100 | FEB: 100 | MAY: 100 | AUG: 0 |
| DEC: 100 | MAR: 100 | JUN: 0 | SEP: 0 |

Document specific, objective transition related events and issues that have contributed to this outcome.

**Staffing**

> Requirements for an internal Systems and Business Support Unit (SBS)
>> Promotion of CSR to the SBS Unit
>> Promotion of CSR to replace other position vacated due to the implementation of SBS Unit
> VMS transition related resignations
> VMS classroom training and hands on practice time
> Unavailable internal backup resouce due to VMS related activties

**Increase in call volume due to VMS implementation**

> Transition related system issues
> Aged pending
> Transition related processing errors
> Untimely recons, adjustments, etc.

**Increase in Correspondence due to VMS implementation**

> Substandard telephone performance (% within 120 sec; ATB)
> Transition related system issues
> Aged pending
> Transition related processing errors
> Untimely recons, adjustments, etc.

Name: Daniel M. Fedor

Date: 9/17/98

# 1998 Management Objectives

| OBJECTIVE | EXPECTED OUTCOMES | WEIGHT |
|---|---|---|
| Assure adherence to Gov't Ops Business Practices program | Report all compliance issues to appropriate parties. Assist as needed in case development Provide personal leadership by example. | 15% |
| Meet HCFA expectations while adhering to business practices concepts | Actively address previously identified performance issues. Achieve acceptable outcomes in current review activities. Provide personal leadership by example. | 30% |
| Effectively transition to VMS processing system while adhering to business practices concepts. | Demonstrate a cooperative, proactive participation in the process. Anticipate support needs and develop solutions for your operational area. Provide positive, encouraging leadership for your staff. Provide strong post-transition leadership to re-establish performance outcomes. Provide personal leadership by example. | 30% |
| Provide effective performance management of operational units while adhering to business practices concepts. | Timely completion of interim and final performance evaluations. Proactive, personal influence regarding installation of teaming initiatives. Development of performance standards for all direct reports. Proactive integration of opportunites for initiatives shared with other units. Provide disciplined, equitable management of sub-standard performance issues. | 25% |



To:        Scott Greer

From:      Fred Larsen

Re:        Provider line recovery

Date:      October 30, 1998


    The following issues are included in consideration of our recovery of service on the provider lines.

## Conversion related volume

    Call volume related to the conversion will continue until inventories are back to normal levels and we have reduced the number of conversion related systems issues producing negative outcomes.

## Auto-generated volume

    I have discussed this issue in my Email to you regarding our publication schedules connected to conversion recovery. We are seeing an increasing number of call patterns that can be traced back to policy change, abatements (EOMB suppresion), and our internal procedures, interpretations, and assumptions. We are investing time to identify as many of these as we can by November 13. Some of these may be amenable to quick action with a quick payback. The benefit of others will likely appear more slowly.

## System

    It is clear that navigation of VIPS system and its logging and tracking system (ICOR) is more time consuming that our previous system. Having said that, we believe in the long run we will have a much better basis for provider education as discussed in my October 30 communication to Jim Clark. The fact remains, however, all other things being equal, it takes more people to handle the same number of calls using the VIPS system.

## Staffing

    The importance of having adequate numbers of representatives is a given. Less evident, however, is the impact of individual experience levels. At the moment only 27% of our staff is experienced enough to successfully handle the total spectrum of supplier calls. New people improve weekly, but this issue is impacting our operation.

-there is no room in the facility to add staff to the current population
-some portion of the current population must be reassigned and trained
-availability of staff for retraining is dependent on recovery from
　　　other conversion related issues
-technical enhancements must be acquired, installed, and tested.

Given the differential between provider service staff requirements and currently available staff and the scenario for acquisition of the required staff, it is difficult to establish prospective service trend lines for the next several months. As referenced in my October 30 communication, one key initiative is the identification of auto generated call volume. By November 13, we will have identified those issues that have potential for call volume reduction. This initiative includes the entire organization. In addition to the prospect of reducing call volume, this analysis is intended to remove extraneous work from service representatives, increasing their availability for interface with callers. I expect to set daily provider call volume targets after we see the affect of this initiative. At this point, given the disparity between the resource we have and the resource required, it does not seem practical to establish near term objectives for all trunks busy. That performance standard is directly related to staff, an issue that will only change over the time frames discussed above.

To:        Scott Greer

From:      Fred Larsen

Re:        Provider Line Recovery

Date:      November 6, 1998

I have previously discussed the increased call length that we have seen after conversion to the VIPS system. We feel this is substantially related to increased time required to access information and populate the ICOR system regarding the call.

Beneficiary call length has moved from about 2 minutes 45 seconds to 3 minutes 40 seconds. An increase of 33%. Given a daily average volume of 1700 beneficiary calls, a staff of 18 is required.

Provider call length has moved from two minutes 30 seconds to 6 minutes, an increase of 140%. Given a daily average volume of 1800 provider calls, a staff of 28 is required.

While some current call volume is clearly related to the conversion, we do not feel that call length is affected by conversion issues. The change in call length will have a permanent impact on staff requirements. In total, the increased length in both call types will require a staff increase of about 85%.

We feel we will not be in a position to have provider call service restored to normal levels until April 1, 1999. As I discussed under the Technology heading in my memorandum of October 30, 1998, the permanent resolution of provider service issues requires that we change the content of the job, which is dependent on changing our call distribution technology.

In the interim, we reallocate staff to the provider calls when possible. Until we make the operational changes required however, we do not have space in our facility to seat the number of people required under the current approach. The customer service staff needs must be acquired from staff gains coming from paper claim outsourcing and increased electronic claim through put efficiencies. That staff will be released and trained as conversion related inventories are reduced.

We are currently exploring options regarding the technology change. While we are confident the change is possible, we are evaluating sourcing, cost and service options.

Restoring provider service to acceptable levels by April 1, 1999 must be considered using the following assumptions:

## Technology

At the meeting on October 13 and in discussions with you, I have described what I think we need to do for the long term. We need to reduce the impact of turnover, reduce the complexity of the customer service job (thus providing more consistent service), and provide instant call overflow capacity in the rest of the organization. This can only be accomplished if incoming provider traffic can be channeled based on call content. Doing that will permit movement on all the issues mentioned above. We have the hardware installed to accomplish this. Software is available and is being reviewed at the moment by technical and senior management. A committment has not yet been made. Absent this approach, however, our only alternative is to continue to enlarge the unit, creating more jobs that require knowledge of all 44 medical policies.



Ombudsmen, 10/17

Please
Read

letter TO Dennis C.

D.7

D.7.7 - 11/4/98

↓V
10/26/98

TO - 10/26/98
UR - 11/2/98
(R - 11/4/98

(@ 11-4-98



# NAMES

**National Association for
Medical Equipment Services**

*Via Fax*

October 15, 1998

Mr. Dennis Carroll
Regional Administrator
HCFA Regional Office
P. O. Box 7760
Philadelphia, Pa. 1901

Dear Mr. Carroll:

We are writing on behalf of our members, home medical equipment (HME) providers in Durable Medical Equipment Carrier Region A ("Region A DMERC"), to express our alarm and frustration at the lack of a timely resolution to the payment delays resulting from the DMERC's transition to the "VIPS" system. Collectively, our members have millions of dollars in claims outstanding over thirty (30) days. The outstanding claims are the result of improper denials, backlogs in informal reviews and fair hearings, duplicate denials, and incorrect denial codes affecting the ability of our members to bill secondary payers, among other issues. The impact on our members has been harsh. Some NAMES members report that they have had to reduce staff and are facing action from their vendors.

Inadequate staffing has added to the confusion. For example, we are told that temporary staff retained by the DMERC did not properly complete EDI enrollments. As a result, our members received "front end" rejection of claims totaling millions of dollars which had to be resubmitted. Although our members have been told that the problem has been corrected, the incident serves as a snapshot of the crisis gripping the DMERC. Adding to the frustration, our members report waiting as long as three hours to talk to customer services staff at the DMERC. Often, after these interminable waits, our members have reached the DMERC staff only to be informed that no further questions will be accepted for that day.

As you are aware, both NAMES members and members of the state HME associations representing Region A have worked closely with the DMERC on the Region A Council to resolve these issues promptly and effectively. When it became apparent that these problems would remain unresolved for the near future, we proposed to the DMERC that providers in Region A who requested advance payments receive them promptly as one way of ameliorating their cash flow problems. We have also proposed to your office that HCFA eliminate the

625 Slaters Lane • Suite 200 • Alexandria, VA 22314-1171 • (703) 836-6263 FAX (703) 836-6730

A: 95498 To: FRED LARSON
OCT-15-1998  19:13        NAMES        703 836 6730   P.03/05

fourteen (14) day floor on Medicare payment.

It is now more than thirty (30) days since we initiated these proposals. During this time, our members have continued to work towards a resolution with the DMERC and with HCFA staff. While our members do report improvement in the payment of some current Medicare claims, they remain concerned about the unresolved backlog which for many now represents a substantial portion of their claims. Further, as we describe more fully below, the advance payment mechanism has proved to be a hollow remedy. We believe that circumstances in Region A warrant HCFA oversight of advance payment determinations by the DMERC. More importantly, our view is that the circumstances in Region A compel HCFA to eliminate the fourteen (14) day floor for Medicare payments.

**Continuing Payment Delays**

We are aware of the September 29, 1998 letter from the DMERC to Mr. Jim Clark and the Region A Council. We do not, however, have adequate evidence that the DMERC is moving towards an effective resolution of those issues. For example, the letter states that problems relating to HCPCS code EO450 (ventilators) have been corrected and that payment adjustments for erroneously denied claims are underway. However, many members report that these claims continue to remain unpaid.

Moreover, we believe that the available DMERC statistics do not accurately portray the gravity of the situation both in the number of claims pending and the dollar value of those claims. Initially, we note that the DMERC's most recent report on processing timeliness states that as of October 2, 1998 thirty percent (30%) of its pending claims were over thirty (30) days old. See Letter dated October 5, 1998 to Mr. Jim Clark, Clark Respiratory, from Mr. Dwayne Thomas, Claims Manager, Region A DMERC.

While unacceptably high, this number does not even capture the claims that have been improperly denied or the claims that have been denied improperly as duplicate denials because these claims have been "processed", albeit incorrectly, and are no longer "pending". Likewise, this figure does not appear to include the claims that are backlogged for fair hearings, informal reviews and reconsideration. It also is our understanding that although some claims have been processed, denial codes assigned to them have been incorrect, affecting the provider's ability to bill the secondary payer. Thus, the impact of the payment delays related to the transition far exceeds the thirty percent (30%) figure provided by the DMERC.

To illustrate the "bottom line" impact on providers we offer you the following data from a sample of our members. The providers below are located throughout Region A, including New England, Pennsylvania and New York.

2

|            | 30-60   | 60-90   | over 90   | Total Medicare over 30 days |
|------------|---------|---------|-----------|------------------------------|
| Provider A | 897,965 | 574,518 | 2,375,800 | 63% |
| Provider B | 20,666  | 11,999  | 81,340    | 72% |
| Provider C | ——      | ——      | 281,982   | 73% |
| Provider D | 21,000  | 20,000  | 27,000    | 45% |
| Provider E | 272,443 | 163,361 | 920,000   | 67% |

We note that the foregoing amounts do not include the value of the cross over claims that Region A providers have been unable to bill. Likewise, it does not include claims pending reviews and fair hearings in excess of thirty (30) days. Provider A above, for example, has $522,000 pending review and $60,000 pending fair hearings. Provider C has $100,000. We believe that the value of the claims in the reviews and fair hearing backlog far exceeds any of the DMERC estimates to date. In fact, our members report that the DMERC has been unable to provide reliable reports on the number and the status of the backlogged claims. We request that you ask the DMERC to provide you and us with this information at its first opportunity.

## Advance Payment Issues

The advance payment remedy has proved inadequate as implemented by the DMERC. For example, one member requested an advance of $70,000 but was approved only for a $12,000 advance. The provider can document over $100,000 in aged receivables from Medicare. Nonetheless, in determining the amount of advance payment, the DMERC has applied a rigid formula without any consideration of the extraordinary circumstances that this provider faces through no fault of its own.

Similarly, DMERC representatives stated that they would identify providers that, according to its records, were eligible for advance payments. The DMERC stated that these providers would be invited to apply for an advance payment. We have learned that while the DMERC letter inviting providers to request advance payment acknowledges that the provider has experienced "a large number of erroneously denied claims", the amounts that the DMERC has offered as an advance are too small to justify the administrative burden of obtaining an advance payment. For example, one provider was invited to request an advance payment of $1,059.42.

We strongly urge HCFA to review the procedures employed by the DMERC in making these

3

95498 To: FRED LARSON          Date: 10/16/98 Time: 9:18:16 AM                    Page 5 of 5
OCT-15-1998   19:14      NAMES                          703 836 6730   P.05/05

advance payment determinations. HCFA should intervene to ensure that providers receive advance payments that are realistic and equitable when compared to their outstanding Medicare claims. Providers in Region A are not responsible for this predicament. Consequently, HCFA should ensure that they have a meaningful remedy under the circumstances.

**Eliminating the Medicare Payment Floor**

We understand the program integrity considerations involved in making a determination to eliminate the Medicare payment floor. We want to emphasize, however, that we believe that circumstances in Region A would compel HCFA to eliminate the floor now. As we discussed above, neither the DMERC's claim processing reports nor the letter from Mr. Fedor accurately represent the volume or value of the claims caught in this administrative limbo. While we understand that eliminating the payment floor will not "fix" these problems, it will ameliorate some of the cash flow problems faced by our members. We are available to assist HCFA by providing any appropriate additional data necessary to make this determination. This action should be taken promptly to avoid further exacerbation of the problems faced by Region A providers.

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

On behalf of our members in Region A, please be assured of our willingness to continue to work with you and the DMERC towards a resolution of the issues we raised above. In the meantime, we reiterate that HCFA must take appropriate measures now to avoid any further deterioration of this situation. We will be happy to meet with you at your convenience to discuss this matter further. If you have any questions, please feel free to contact me at the number below.

Sincerely,

*Asela M Cuervo*

Asela M. Cuervo
Assistant Vice President of Government Relations
For Regulatory Affairs

cc:    Gary Kavanagh
       Michael Hash
       Scott Greer

4



Copied
12-14
JRO

Managers—
This is the letter referred to
in my voice mail earlier
today —

JL 12/14

Region III
Health Care Financing
Administration

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Refer to:  R3-18 (12)
File Code:  DMERC-Pert

DHHS/HCFA/CPOB
Suite 216, The Public Ledger Bldg
150 S. Independence Mall West
Philadelphia, PA 19106-3499
Decembr 14, 1998

Mr. Fred Larsen
District Manager
United HealthCare, Region A DMERC
603 Main Street
Nanticoke PA 18694-1685

Dear Mr. Larsen:

We are concerned by the lack of timely progress that DMERC A has made in recovering
from the conversion to VIPs system and in adapting to the new system. Carriers' performance
is generally expected to return to normal within three months of a system conversion.
However, almost six months have elapsed since the conversion and DMERC A's
performance remains well below expectations and, in some areas, there does not appear to
be any prospect for immediate improvement. We realize that this conversion was unusually
complex because of the need to convert CMN and related systems files, but the extended
implementation period coupled with an extended recovery period should have facilitated the
recovery from the conversion.

Performance in the customer service area, particularly in telephone service, is a matter of
special concern. DMERC A has not consistently met the two major performance standards
(busy rate and response time) for either beneficiary or supplier telephone service since January
of 1998 and performance has deteriorated to a level that is currently well below both the
DMERC's contractual commitments and our expectations. The most recent information we
have received from DMERC A indicates that performance in the telephone service area will
not return to pre-conversion levels until April of 1999. Such an extended recovery is not
acceptable and every effort must be made to insure that performance in all telephone service
areas fully meets the DMERC's contractual obligations in as timely a manner as possible.

DMERC A's difficulty in addressing issues impacting on the supplier's cash flow coupled
with difficulty in identifying and addressing issues raised by suppliers is a matter of
continuing concern. For example, the DMERC advised the Region A Supplier Council ( the
Council) that the volume of pending claims would be reduced to approximately 225,000, with
aged pending constituting no more than 10% of total pending by the end of October.
However, actual pending was in excess of 300,000 with 19% (57,588) being over 30 days
old. We realize that DMERC A did meet a subsequent commitment to reduce the claims
inventory to 42,000 by November 13, and to 22,000 by November 25, but we also understand
that the DMERC does not expect to be meeting the claims processing timeliness (CPT)

The impact of timely processing of adjustments on the supplier community is especially critical. DMERC A's conversion resulted in the incorrect processing of some claims with the related adverse impact on the supplier's cash flow. We realize that such errors are not uncommon in systems conversions, but we also expect such errors to be promptly identified and corrected, preferably by adjusting (mass adjustments, if possible) the involved claims. The impact on the supplier's cash flow is obviously a matter of serious concern, but delays in promptly addressing these situations via adjustments leads directly to increases in the volume of appeals filed by suppliers. Given the relative effort needed to process an adjustment compared to an appeal, coupled with DMERC A's already critical resource situation, we believe that it is extremely important that all such processing errors be promptly identified and adjusted before the supplier community understandably resorts to the appeals process.

We fully expect DMERC A's performance in all areas to improve to the point of fully meeting its contractual obligations as soon as possible, but in no case later than the end of this calendar year. We will be addressing the need for an acceptable corrective action plan for telephone service through the Contractor Performance Evaluation (CPE), process and we will continue to monitor the DMERC's ability to meet its commitment to both HCFA and the supplier community. Our office should be promptly advised, in writing, if the DMERC finds that it cannot meet its commitments or our expectations.

Sincerely,

/s/

Dennis J. Carroll
Associate Regional Administrator
Division of Beneficiaries, Health Plans and

Providers



## GOVERNMENT OPERATIONS

## EXIT INTERVIEW QUESTIONNAIRE

UNITEDhealthcare

CONFIDENTIAL AND PROPRIETARY

# GOVERNMENT OPERATIONS
## EXIT INTERVIEW QUESTIONNAIRE

Employee Name: Daniel M. Fedor

Office: Nanticoke, PA

Position: Manager - PR/EOI

Employment Date: 5/17/93

Termination Date: 12/31/98

Department/Unit: Professional Relations

Immediate Manager: Fred Larsen

Office Director: Fred Larsen

## Part 1 - General Comments

One way of making Government Operations a better place to work is to obtain feedback from employees who are leaving the company. Please take a few minutes to fill out this form. It is very important that questions 10, 11, 12, and 13 of Part 1 be completed. Please be as open and honest as possible. Your opinions are valued.

1. **What did you like best about working at United HealthCare?**

   Fringe Benefits (vacation, medical, dental, etc.); Employees (Peers + Subordinates)

2. **What did you least like about working for United HealthCare?**

   Not having enough resource to produce a Quality Product (claims, customer service, etc.); Lack of direction / Leadership; Compliance issues (current director)

3. **Please describe the management/supervision in your area. Cite positive and/or negative experiences.**

   When I describe management/supervision from this point forward I will be referring to my current supervisor, Fred Larsen.

1

CONFIDENTIAL AND PROPRIETARY

4. **How would you describe the feedback (Performance Plans, Compensation Plans, quality reviews, formal or informal) regarding your performance?**

NOT Beneficial; very vague; Development opportunities are identified but no improvement plan is discussed with supervisor (Fred)

5. **How do you feel about communications in your specific area or unit? How about communications within your office location? Overall communications in general?**

IN my units I feel That Communication is Good. Open Communication is NOT Promoted by senior management (Director); Communication is Selective; Until Recently (November 98) Problems could not + were not discussed by MGMT. Leadership only wanted To hear Good Things

6. **Did you feel a strong commitment to excellent customer service and quality in your area? How about throughout your particular division/office? Throughout the corporation?**

IN my areas, yes! In The office Absolutly NOT! Overall Customer service in The office is nOT Promoted by each unit Manager nor The Director. Suggestion: Implement Customer service Driven Quality! Suggest Pride.

7. **In your opinion, did your immediate manager promote an atmosphere which encouraged open and free exchange of information and ideas?**

NO. Well I Should say yes it is Promoted (Talk) but NOT accepted. my immediate Supervisor was (is) Too involved in minor issues + NOT systemic Problems.

8. **Did you feel your immediate manager to be fair in dealing with employees?**

For MOST yes. However value was Given To The employee/manager who got The numbers, no matter How The results were accomplished (compliance?).

I believe employees/managers were afraid To say "it can't be done." MOST would say yes I can do it Even if They knew That it could nOT be done Properly with Current Resource, etc.

?

CONFIDENTIAL AND PROPRIETARY

9. Did you participate in developing your performance goals with your manager? How did you feel about this process?

NO. See number 4. Performance evaluation were NOT adequate. also, Managers had too much on their plates to give good performance evals. Inadequate training on Performance Management.

10. Did your immediate manager address any ethical questions/concerns that you may have had during your employment in Government Operations?

Yes. I reported 2 issues to my immediate supervisor (Fred). A Q cap on Provider + Bene Phone lines (Customerservice), April 98; Prior Management instruction to CSRs to disconnect caller if Q (hold) was too high. This skews numbers.

11. If you disagreed with a policy/procedure in Government Operations, did you have the opportunity to discuss your concern with your immediate manager, next higher level manager or someone in authority (i.e., were you ever asked to do something that you thought unethical by anyone in authority)?

write on both description of issue

"I was never asked" to do something unethical. I am aware of unethical activities that were brought to the attention of my supervisor but no action was taken. (action may have been taken that I am unaware of. Given the secrecy of the activity I could only assume that action was NOT taken.)

12. Within your experience, did any manager or employee attempt to retaliate against you for raising an ethical concern?

Not that I believe. unsure.

_____

_____

13. During your employment, were you aware of any conduct that would violate the Code of Conduct? This includes, but is not limited to, the giving or taking of bribes, misrepresentations made to the government, violations of the Conflict of Interest Policy, violations of any other laws or moral or ethical standards?

Yes. Misrepresentations made to the Government with regard to Customer service performance requirements. This occured for a minimum of one year - (3/97-4/98)

The issues were the instruction by mgmt to hang up/ disconnect callers when caller volume got high (qu) and the qu cap issue which misrepresented #'s reported

CONFIDENTIAL AND PROPRIETARY

## Part 2 - Job Rating

Please place a check mark in the appropriate column that most closely matches your feelings.

| | Strongly Agree | Agree | Strongly Disagree | Disagree | N/A or No Opinion |
|---|---|---|---|---|---|
| Training was not adequate | ☑ | ☐ | ☐ | ☐ | ☐ |
| Training was too difficult | ☐ | ☐ | ☐ | ☑ | ☐ |
| Job was too difficult | ☐ | ☐ | ☐ | ☑ | ☐ |
| Job did not make good use of our skills/abilities | ☐ | ☑ | ☐ | ☐ | ☐ |
| Job was different than you were led to believe | ☐ | ☑ | ☐ | ☐ | ☐ |
| Job was different than the training | ☐ | ☐ | ☐ | ☐ | ☑ |
| There was too much pressure from your manager | ☐ | ☑ | ☐ | ☐ | ☐ |
| Overtime requirement was excessive | ☐ | ☐ | ☐ | ☐ | ☑ |
| The job was too stressful | ☑ | ☐ | ☐ | ☐ | ☐ |
| Salary was too low for what was expected | ☑ | ☐ | ☐ | ☐ | ☐ |
| I would reapply for a job at United HealthCare | ☐ | ☐ | ☐ | ☐ | ☑ |
| I would refer a friend to work for United HealthCare. | ☐ | ☐ | ☐ | ☐ | ☑ |

*"try to get job done without proper resource - squeezing blood out of a rock"*

*Not enough resource to do a quality job*

*Not promoted to salary grade 27 - lack of recognition*

4

CONFIDENTIAL AND PROPRIETARY

**Based on all your comments, your primary reason for leaving United HealthCare is:**

when the office Director values employees +
actions that are unethical I realized that this
was not the place for me. Providing office wide
customer service is not a top priority (i.e. Adjustments)

**If employment elsewhere applies, would you be willing to provide the following:**

Name of New Company: _____ N/A    prefer not to put down_____

Position: _____

Salary: Substantial increase over UHC pay.

Additional Comments: at UHC at one point managing 60 FTE's and
Don will make substantially much more being
responsible for self.

Managers at DMERC are good, but atmosphere causes
them to not function as a team... everyone has to
worry about themselves and due to environment.

## Part 3 - Acknowledgment and Signature

*(Completion of this section by the employee is required)*

I verify that I have been given the opportunity to discuss any issues regarding Government
Operations Code of Conduct and any questions concerning ethical issues with my immediate
manager, next higher level manager, someone in authority, or during this Exit Interview
Conference.

Employee Signature: _____  Date: 12/31/98

Human Resource Signature: _____  Date: 12/31/98

Immediate Manager
Government Operations: _____  Date: _____

5

CONFIDENTIAL AND PROPRIETARY

---

**THIS SECTION TO BE COMPLETED BY THE HUMAN RESOURCES DEPARTMENT ONLY**

---

**INTERVIEWER'S COMMENTS**

DF to Cancel calling card / American Express – give cards to Mari
all expense reports submitted to date
Change address on credit card – made to home address

paycheck mailed to home

6

(11.) Issues :* <u>Q Cap</u> - There was a Cap on The Provider + Bene lines From (3/97 - 4/98). It may have been for a longer Time Period. This is all I can Confirm with CMS Reports. Provider line had a Cap of 8. The 9th caller would be accepted into The ARU when/if The caller selected. To speak with a Representative The call would be Routed To a Busy/disconnect. Bene line had a Cap of 6. The 7th caller would get The same results as mentioned above. The unit Manager + Supervisor were aware of This Cap.

* Releasing calls - Prior To The Q Cap The unit manager instructed CSRs To hang up/disconnect callers if There were too many in The Q (onhold). This of course skewed The